UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TONIE CEBALLOS o/b/o A.R.C.,

                                    Plaintiff,

v.                                                                      3:14-CV-0659
                                                                        (DNH/TWD)

CAROLYN COLVIN, Acting Commissioner of
Social Security,

                                    Defendant.
_____

APPEARANCES:                              OF COUNSEL:

COUGHLIN & GERHART, LLP                   SCOT G. MILLER, ESQ.
*Counsel for Plaintiff*
P.O. Box 2039
Binghamton, New York 13902-2039


HON. RICHARD S. HARTUNIAN                 JOANNE PENGELLY, ESQ.
United States Attorney for the            Special Assistant United States Attorney
  Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207


OFFICE OF GENERAL COUNSEL                 STEPHEN P. CONTE, ESQ.
Social Security Administration            Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278


THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned for report and recommendation by the

Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) (2013)

and Northern District of New York Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits.  Both parties have filed briefs.  Oral argument was not heard.  For the reasons discussed below, it is recommended that the matter be remanded to the Commissioner for further proceedings consistent with the findings set forth below.

## I.       BACKGROUND AND PROCEDURAL HISTORY

On June 15, 2011, Plaintiff Tonie Ceballos protectively filed an application for Supplemental Security Income ("SSI") benefits under the Social Security Act on behalf of her child A.R.C., who was nine years old at the time of the hearing.  (Administrative Transcript ("T") at 98-103.[1])  Plaintiff alleges that A.R.C. suffers disability due to Attention Deficit Hyperactivity Disorder ("ADHD") and a history of fine motor skills delay.  (T. at 21, 118; Dkt. No. 9 at 5.[2])

The application for SSI benefits was denied on September 14, 2011.  (T. at 58-61.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (T. at 62-64.)  The hearing was held on October 2, 2012.  (T. at 34-56.)  On November 15, 2012, the ALJ issued a decision finding that A.R.C. was not disabled.  (T. at 15-33.)   The ALJ's decision became the final decision when the Appeals Council denied Plaintiff's request for review on April 3, 2014.  (T. at 1-6.)  Plaintiff commenced this action on June 3, 2014.  (Dkt. No. 1.)

---

[1]  The Administrative Transcript is found at Dkt. No. 8.  Citations to the Administrative Transcript will be referenced as "T" and the page numbers as set forth therein will be used rather than the numbers assigned by the CF/ECM docketing system.

[2]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system.

## II.    APPLICABLE LAW

### A.    Standard for Benefits

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)), the Social Security Administration ("SSA") promulgated regulations establishing a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of a disability.  20 C.F.R. § 416.924(a).  First, the ALJ considers whether the child is engaged in "substantial gainful activity."  *Id.* at § 416.924(b).  Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations."  *Id.* at § 416.924(c).  Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment meets, medically equals, or functionally equals a disability listed in the regulatory "Listing of Impairments."  *Id.* at § 416.924(d).

In order to show that an impairment matches a Listing, the child must show that his or her impairment meets all of the specified criteria.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); 20 C.F.R. § 404.1525(d) (2007).  In order to determine whether a child's impairment "functionally equals" a Listing:

The ALJ must examine the evidence of record and determine a

child's level of functioning in "six domains." The six domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. If a child has "marked" limitations in two of the domains or an "extreme" limitation in one domain, then his impairments will "functionally equal" the Listings, and he will be found disabled.

*White ex rel. Johnson v. Barnhart,* 409 F. Supp. 2d 205, 207-08 (W.D.N.Y. 2006) (citing 20 C.F.R. § 416.926a(b)(1); 20 C.F.R. § 416.926a(d)).

Social Security Regulation 20 C.F.R. § 416.926a(e)(2), sections (i) and (iii), define "marked" limitation as follows:

> (i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

> \*  \*  \*

> (iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score. (*See* paragraph (e)(4) of this section.)

20 C.F.R. § 416.926a(e)(2).

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the

correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record.  *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citations omitted).  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if

the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.    THE ALJ'S DECISION

Here, the ALJ found that A.R.C. was not disabled at the third step of the analysis explained above.  (T. at 22-30.)  The ALJ first found in conclusory fashion that the record did not contain adequate clinical findings needed to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P. Appendix 1 ("Appendix 1").  (T. at 22.)  The ALJ then found that A.R.C. does not have an impairment or combination of impairments that functionally equals any of the Listings.  (T. at 22.)  That finding was based upon the ALJ's determination that A.R.C. did  not have a "marked" limitation in at least two of the six domains, or an "extreme" limitation in one of them.  (T. at 24-30.)   More specifically, the ALJ found that A.R.C. had a "marked" limitation in "acquiring and using information"; "less than marked" limitations in "attending and completing tasks" and "moving about and manipulating objects"; and no limitations in the other three domains.  (T. at 25-30.)

## IV.    THE PARTIES' CONTENTIONS

Plaintiff claims that the ALJ erred by: (1) failing to properly consider whether A.R.C.'s impairments met or equaled Listing 112.05D when the record is clear that 112.05D is met; and (2) failing to properly develop the record by not obtaining A.R.C.'s school records and failing to take the testimony of A.R.C.  The Defendant contends that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

## V.    A.R.C.'S SCHOOL RECORDS

The Disability Worksheet on A.R.C.'s application for SSI benefits, reveals that the

Commissioner requested school records from the Stanford J. Gibson Primary School, and from the Norwich Central School District in which the school is located on June 27, 2011, and again on July 11, 2011, and received no response from either the school or the district. (T. at 203-04.) On October 2, 2012, following the hearing, the ALJ sent a written request for records to the Perry Browne Intermediate School at which A.R.C. was by then a student. (T. at 147.) The ALJ requested that an enclosed teacher questionnaire be completed by the person most familiar with A.R.C.'s overall functioning and asked that all of her records from March 1, 2010, to the present, including IEPs, psychological achievement testing, report cards, OT/PT records, and disciplinary reports be provided. *Id*.

The completed questionnaire was returned on or about October 15, 2012, by A.R.C.'s current teacher, who described herself as having been her teacher for all subjects from 8am to 3pm Monday through Friday for two months. (T. at 162-69.) The teacher listed the fourth grade as A.R.C.'s actual grade level and described the teacher pupil ratio as 16:2:1. (T. at 162.) The space for information regarding "Special Ed Services & Frequency" was left blank. *Id*. A.R.C.'s reading level was listed as first grade, her math level at second grade, and her written language at first grade. *Id*. The record reflects that none of A.R.C.'s records that had been requested were received by the ALJ.

On "acquiring and using information" A.R.C., as compared to the functioning of same-aged children who do not have impairments, was rated by her teacher as having no problem with understanding school and content vocabulary; comprehending and doing math problems; understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; learning new material; recalling and applying previously learned material;

and applying problem-solving skills in class discussions. (T. at 163.) She was rated as having a slight problem with comprehending oral instructions, and having an obvious problem with reading and comprehending written material; providing organized explanations and adequate descriptions; and expressing ideas in written form. *Id*. A.R.C. was not identified as having a serious or very serious problem with respect to any of the items included in "acquiring and using information." *Id*. The teacher noted that A.R.C. could follow directions and did many things independently. *Id*.

Under the category "attending and completing tasks," A.R.C. was rated as having no problem paying attention when spoken to directly; sustaining attention during play/sports activities; refocusing to task when necessary; carrying out single-step instructions; waiting to take turns; changing from one activity to another without being disruptive; organizing her own things or school materials; completing class/homework assignments; and working without distracting others. (T. at 164.) She was rated as having a slight problem on a weekly basis with working at reasonable pace/finishing on time. *Id*. A.R.C. was rated as having an obvious problem on a daily basis with focusing long enough to finish assigned activity or task, and an obvious problem on a weekly basis with completing work accurately without careless mistakes. *Id*. The teacher noted that A.R.C. became distracted when working independently and in a large group, sometimes rushed through tasks to get them done, and made silly mistakes when writing. *Id.*

The teacher indicated that A.R.C. had no problems under the category "interacting and relating with others" and that she was able to understand almost all of A.R.C.'s speech on the first attempt. (T. at 165-66.) She also found that A.R.C. had no problems under the category

"caring for himself or herself." (T. at 167.)

## VI. BASSETT HEALTHCARE RECORDS

The ALJ also wrote to Bassett Healthcare ("Bassett") following the hearing and requested all of A.R.C.'s records from October 23, 2010, to the present. (T. at 159.) Bassett provided records from the Bassett Medical Center Location in Norwich, New York, where A.R.C.'s parents initially brought her to be tested for ADHD on October 18, 2011. (T. at 209-42.) The patient history by Dr. Jennifer O'Reilly, M.D., noted that A.R.C.'s parents reported a lack of listening and frequent mood swings at home with occasional hitting. (T. at 212.) A.R.C. was reported as having problems primarily with her mother and her sister, with whom she became angry when she would not play with her. A.R.C. was also reported as becoming antagonistic with others and picking on kids when she felt angry. *Id.* According to her parents, the symptoms started a year before the visit right before school, and had worsened. *Id.* A.R.C. was described as listening but fighting back; having selective hearing; very high energy; easily distracted; never completing a task; becoming bored easily; and being difficult to awaken in the morning. *Id.*

A.R.C. reported that she enjoyed going to school and liked her family but just "gets mad" at them. *Id.* She denied anxiety and showed no symptoms of depression. *Id.* Her parents indicated that she had been a really good student in school, made good grades, and had no bad reports from teachers. *Id.* Dr. O'Reilly noted a maternal family history of ADHD. *Id.*

Dr. O'Reilly's initial assessment was outburst of anger and family discord. (T. at 213.) Dr. O'Reilly provided the parents with Vanderbuilt questionnaires to be filled out by the parents, teachers, and other adults involved with A.R.C. and returned to her. *Id.* The parents and A.R.C. returned for a follow-up visit with Dr. O'Reilly on November 1, 2011, and brought completed

questionnaires from school, daycare, and home.  (T. at 216-17.)  According to Dr. O'Reilly, the questionnaires were consistent and all reported difficulties with organization; poor concentration; short attention span; switching focus quickly; and being impulsive a times.  (T. at 17.)  The school form indicated a significant impact on school work but no indication that A.R.C. was disruptive.  *Id*.

Dr. O'Reilly diagnosed A.R.C. with Attention Deficit Disorder and prescribed Methylphenidate (Ritalin) 5 mg once a day.  (T. at 217, 221.)  At a follow-up visit on November 15, 2011, Plaintiff reported that they had seen a "huge" difference in A.R.C.'s ability to concentrate and do homework at home, and that the school work being sent home was much better.  (T. at 224.)  Plaintiff was very happy with the results of the medication.  *Id*.

At a follow-up visit on January 13, 2012, the parents reported that A.R.C. continued to do well on the medication but that it seemed to wear off in the afternoon, and she had difficulty with school and activities in the afternoon with her hyperactivity getting her into trouble.  (T. at 231.)  Dr. O'Reilly increased the medication to 10 mg multiphase per day and adjusted the timing to right before school rather than early morning.  (T. at 232.)  As of May 25, 2012, A.R.C. was taking Methylphenidate (Ritalin) 5 mg twice a day and 3 mm of Melatonin.  (T. at 146.)

## VII.    CONSULTATIVE EXAMINATIONS

### A.    Pediatric Examination

On August 23, 2011, a consultative pediatric examination was performed on A.R.C. by Dr. Justine Magurno, M.D., (T. at 178-82.)  The examination was requested with regard to A.R.C.'s fine and gross motor skills.  (T. at 178.)  At the examination, A.R.C.'s father reported that she was entering third grade in regular education and that she had begun receiving

occupational and physical therapy when she entered school, although he was unsure why.  *Id.*

Dr. Magurno found A.R.C.'s behavior to be normal for her age, that she related to the examiner in an age-appropriate way, and appeared to have a normal attention span for her age. (T. at 179-80.)  Dr. Magurno observed that A.R.C.'s fine motor activity of her hands appeared clumsy for her age, but that she could handle large and small objects in an age-appropriate way, could write with a pen, copy a square and a cross, print her name, and draw a person with six parts, albeit it in a manner that seemed somewhat young for her age.  (T. at 181.)  The strength in A.R.C.'s hands was age appropriate, and she could make a good fist bilaterally.  *Id.*

Dr. Magurno diagnosed A.R.C. with ADHD and probable fine motor delay and opined that there would be mild to moderate limitations for educational activities due to fine motor delay but likely no limitations for recreational and social activities.  *Id.*  Dr. Magurno assessed A.R.C.'s prognosis to be fair with treatment.  *Id.*

**B.      Psychiatric Examination**

Dr. Mary Anne Moore, Psy.D., performed a State agency consultative psychiatric examination of A.R.C. on August 23, 2011.  (T. at 183-87.)  A.R.C. was accompanied by her father who again reported that she would be entering regular third grade.  (T. at 183.)  A.R.C. reported losing her temper at home and sometimes slapping her eleven year old sister; engaging in excessive movement in school; fidgetting; getting in trouble at school for excessive talking; and having problems with impulsivity and disorganization.  *Id.*  She noted that she felt sad at times but not in the extreme; did not cry excessively; did not have excessive worries; and that she sometimes hit herself on the cheek when she became frustrated.  *Id.*

Dr Moore found A.R.C.'s attention and concentration and recent and remote memory

skills to be mildly impaired (T. at 185.) Dr. Moore observed that A.R.C.'s cognitive functioning fell in the borderline intellectual ability with severe deficits in her visuomotor coordination. *Id*. A.R.C. was determined to have a general fund of information appropriate to experience. *Id.* Her judgment was assessed as fair with learning and coordination issues and mild ADHD. *Id.* Dr. Moore noted that A.R.C. could dress herself; could button and zip, but was still learning to tie; needed help washing her hair but could adjust the water and brush her teeth; helped with household chores at times; had friends with whom she got along well; enjoyed going to sleepovers and playing board games; and loved playing with her cat. *Id.*

Dr. Moore opined that A.R.C. was an engaging young girl who was able to interact with peers and adults; she might not always be aware of danger and needed to take precautions; was not asking questions and requesting assistance in an age appropriate manner and acted somewhat impulsively at times, although not to the extreme; and exhibited difficulties with regard to her motor coordination and auditory memory, which could cause problems in asking questions, learning in accordance with her cognitive functioning, and responding appropriately to changes in her environment. (T. at 186.)

A.R.C. was diagnosed with mild ADHD; development coordination disorder; learning disorder with auditory memory difficulties; borderline intellectual functioning (provisional); and motor coordination issue. *Id.* Dr. Moore recommended that A.R.C. continue to receive special services within the school setting, including occupational and physical therapy, if she continued to exhibit difficulties with regard to the ADHD, which was interfering more with her learning, and that she receive psychiatric and psychological treatment. *Id.* A.R.C.'s prognosis was judged to be fair, with the hope that with treatment it would become more positive. (T. at 187.)

12

C.       **Child and Adolescent Vineland Assessment**

Dr. Moore also performed a Child and Adolescent Vineland Assessment of A.R.C. on August 23, 2011.  (T. at 188-91.)  Dr. Moore found A.R.C. to have expressive and receptive language abilities that appeared to be slightly below age expectancies with vocabulary; be generally cooperative, friendly, relaxed and comfortable; require some repetition of instructions; respond in a generally deliberate, and self-correcting style; work with reflection and deliberation for the most part; occasionally be somewhat impulsive and in need of reminders to slow down; and show some distractability.  (T. at 189.)

The results of the Vineland Adaptive Behavior Scale II were:

| Area | Standard Score | Age Equivalent |
|---|---|---|
| COMMUNICATION | 79 | |
| Receptive Language | | 4.7 |
| Expressive Language | | 2.2 |
| Written | | 7.9 |
| | | |
| DAILY LIVING SKILLS | 81 | |
| Personal Living Skills | | 5.2 |
| Domestic Living Skills | | 4.11 |
| Community Living Skills | | 6.7 |
| | | |
| SOCIALIZATION DOMAIN | 92 | |
| Interpersonal Relationships | | 7.0 |
| Play and Leisure Time | | 5.4 |
| Coping Skills | | 7.1 |

Dr. Moore concluded that the results appeared to be consistent with psychiatric and learning issues that might significantly interfere with A.R.C.'s ability to function on a daily basis.  (T. at 190.)

**D.**     **Child Intelligence Evaluation**

Dr. Moore also performed a child intelligence evaluation of A.R.C. on August 23, 2011.

(T. at 192-196.)  Results of the Wide Range Achievement Test, Fourth Edition (WRAT-IV)

administered by Dr. Moore showed a standard score of 82 in Reading/Decoding, with a grade

equivalent of 1.6.  (T. at 193.)   Dr. Moore also administered the Wechsler Intelligence Scale for

Children, Fourth Edition (WISC-IV) with the following results:

| Area | Standard Score |
|------|----------------|
| Verbal Comprehension Index | 85 |
| Perceptual Reasoning Index | 63 |
| Working Memory Index | 65 |
| FULL SCALE IQ | 78 |

(T. at 194.)

Dr. Moore noted that A.R.C.'s Full Scale IQ of 78 indicated that she was functioning the

in the borderline range of ability.  *Id*.  She noted that A.R.C. exhibited significant strength in her

visual processing speed; relative strength in her average abstract verbal thinking ability; low

average in understanding of social expectations and fine motor coordination; borderline skills in

her fund of word knowledge, abstract visual thinking ability, and visuomotor coordination; and

severe deficits in her long-term visual memory and working memory.  *Id*.  Dr. Moore concluded

that overall, A.R.C. appeared to be exhibiting deficits in reading, arithmetic, and written

language abilities.  *Id*.

**E.**     **Non-Examining State Agency Psychiatric Consultant's Evaluation**

Non-examining State Agency psychiatrist consultant, K. Prowda, M.D., and pediatric

consultant, M. Puttanniah, M.D., in their joint evaluation dated September 7, 2011, opined that A.R.C.'s impairments of ADHD and fine gross motor issues were severe but did not meet the functional equivalent of disability.  (T. at 202.)   They also opined, without specific analysis, that A.R.C.'s impairments of ADHD and fine gross motor issues did not meet or medically equal the Listings in Appendix 1.  (T. at 197.)

In their domain evaluations, the non-examining consultants found that A.R.C. had a marked degree of limitation in acquiring and using information based upon her cognitive functioning falling in the borderline intellectual ability with severe deficits noted in visuomotor coordination; full scale IQ of 78, VCI of 85, and PR of 63; occasional impulsivity requiring reminders to slow down; and showing some distractability.  (T. at 199.)

 Drs. Prowda and Puttanniah found that A.R.C. had a less than marked degree of limitation in attending and completing tasks, based upon her attention and concentration and recent and remote memory skills being mildly impaired.  *Id.*  They also found a less than marked limitation in moving about and manipulating objects based on her fine motor delay that would limit her mild to moderately based upon her age for academics, but cause no recreational limitations.  (T. at 200.)  The consultants found no limitation on Interacting and Relation with Others, based upon A.R.C.'s intact social skills as per the record and her Vineland socialization score of 92; no limitation on Caring for Yourself, based upon the record; and no limitation on Health and Physical Well-Being, based upon A.R.C. doing fine with no medication for her ADHA and occupational and physical therapy at school for her fine motor delay.[3]  *Id.*

---

[3]  As with the examinations and evaluations by Drs. Magurno and Moore, the joint evaluation was done prior to the time Dr. O'Reilly prescribed Ritalin for A.R.C. in November of 2011.

## VIII. HEARING TESTIMONY

Plaintiff and A.R.C.'s father appeared at the hearing before the ALJ on October 2, 2012, without A.R.C., despite the bold statement in the July 25, 2012, hearing notice sent to Plaintiff that "**the child should be present at this hearing so the ALJ can consider the case fully**." (T. at 36-37, 87.) When asked by the ALJ why they did not bring A.R.C., Plaintiff responded that someone from SSI had told her not to bring the child. (T. at 37.)

The ALJ also asked Plaintiff whether she had looked in to obtaining a representative to help with the case and was told by Plaintiff that she had called several lawyers and never heard back from them. *Id*. The ALJ asked Plaintiff if she wanted one last opportunity to attempt to find a representative, and she indicated that she wanted to try to go ahead on her own. *Id*. Plaintiff acknowledged that she understood she had a right to representation and wished to freely give up that right, and she signed a Waiver of Representation. (T. at 38, 97.)

Plaintiff was the sole witness at the hearing. (T. at 34-56.) Plaintiff testified that A.R.C. was going to school at Percy Browne Intermediate School in Norwich, was in fourth grade, and that beginning that year had been in a special education setting of 13:1:1 and was receiving special help from teachers. (T. at 40-41.) Plaintiff also testified that A.R.C. had an IEP and was going to counseling to make more friends and adapt to school life. (T. at 41.) According to Plaintiff, she met with people at the school to discuss A.R.C.'s IEP every few months, with the last meeting having taken place in the prior school year. (T. at 42.) Plaintiff remembered discussing A.R.C.'s problems with staying still and focused in a regular classroom, so the school was focusing on placing her in a smaller classroom setting. (T. at 47.) Plaintiff testified that

A.R.C. had four teachers in one classroom and stayed in the same classroom except for gym, music, or art class. (T. at 47-48.) A.R.C., who had difficulty with buttons and zippers and could not tie her shoes, also had occupational therapy twice a week. (T. at 49-50.) A.R.C. took the bus to and from school and although there had been no problems recently, used to have to be restrained by a seatbelt because she would not stay still. (T. at 43, 45, 48.)

Plaintiff testified that A.R.C. was taking Ritalin twice a day for her ADHD and was seeing Dr. O'Reilly every few months. (T. at 42.) A.R.C. had difficulty sleeping, which her doctor thought was related to her ADHD. *Id*. According to Plaintiff, A.R.C. did her homework, although sometimes not without a fight, and had regular chores she did around the house. (T at 45.) She liked to watch television, go outside and play with her sister and brother, and play games on the computer. (T. at 46, 52.) Plaintiff identified A.R.C.'s not listening and focusing and getting into spats with her sister as problems she saw at home on a daily basis. *Id*. According to Plaintiff, when her medicine began to wear off in the afternoon, A.R.C. could become a "handful," making it a challenge to take her shopping. (T. at 49.) At times, Plaintiff wishes A.R.C.'s Ritalin could be increased. (T. at 51.)

At the close of testimony, the ALJ explained to Plaintiff and her husband that he was going to try to get A.R.C.'s IEP and have a questionnaire completed by the teachers at A.R.C.'s school, and also to obtain updated medical reports from Bassett. (T. at 53.) He explained that he would send copies of any material he received to Plaintiff and her husband and told them if they saw anything in the materials they wanted to bring to his attention or thought was wrong, to send him a note if they wished. (T. 55.) The ALJ indicated that an envelope with his address on it would be given to them for that purpose. *Id.* The ALJ also informed A.R.C.'s parents that if he

believed he needed to talk to A.R.C. another hearing would be scheduled.  (T. at 54.)   The ALJ

sent A.R.C.'s parents a copy of the completed teacher questionnaire on October 22, 2011, and

inquired whether they had any objection.  (T. at 170.)  There is nothing in the record indicating a

response from the parents.

## IX.    DISCUSSION

### A.    Plaintiff's Contention that the ALJ Failed to Properly Consider Whether A.R.C.'s Impairments Met or Equaled Listing 112.05D, and that the Listing is Met

The ALJ wrote in his decision that he had given close consideration to the childhood

impairment Listings, including Listing 112.00 for mental disorders, and found that the record did

not contain adequate clinical findings needed to meet or medically equal one of the listed

impairments in Appendix 1.  (T. at 22.)  The ALJ provided no explanation for his finding.

Plaintiff claims that because A.R.C.'s symptoms appear to match those in Listing 112.50D, the

ALJ was required to engage in a comparison of her symptoms with the 112.50D criteria.  (Dkt.

No. 9 at 14.)

112.05 provides in relevant part as follows:

> 112.05 Intellectual Disability: Characterized by significantly subaverage intellectual functioning with deficits in adaptive functioning.
>
> 1.   The required level of severity for this disorder is met when the requirements in A, B, C, D, E or F are satisfied.
>
> *    *    *
>
> D.  A valid verbal performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function.

Appendix 1, § 112.05D.  The preamble to the mental health Listings for children at 112.00D(9)

states that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with listing 112.05." Appendix 1, §112.00(D)(9). *See Juckett ex rel. K.J. v. Astrue*, No. 09-CV-708 (FJS/VEB), 2011 WL 4056053, at *6, 2011 U.S. Dist. LEXIS 102866, at * 15-16 (N.D.N.Y. June 29, 2011) (112.00D(9) required the ALJ to use the lowest Wechsler score in conjunction with Listing 112.05).

Plaintiff claims that A.R.C.'s impairments meet or medically equal Listing 112.05D because although her full scale IQ was 78 on the WISC-IV, her Perceptual Reasoning Index was only 63, and as the lowest score, must be used in determining whether Listing 112.05D applies. (Dkt. No. 9 at 16.) Plaintiff contends that A.R.C.'s severe impairments of ADHD and fine motor development delay satisfy the second prong of Listing 112.05D. *See Hamedallah ex rel. E.B. v. Astrue,* 876 F. Supp. 2d 133, 144 (N.D.N.Y. 2012) ("There is authority in this Circuit for the proposition that where the ALJ concludes that there are additional impairments that are severe under § 416.924(c) then the claimant meets the prong two requirement of 112.05D.") (quoting *Juckett*, 2011 WL 4056053, at * 7-8).

Where a claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or medically equal the Listings. *Hamedallah,* 876 F. Supp. 2d at 142 (citing *Booker v. Heckler*, No. 83 Civ. 5300 (RLC), 1984 WL 622, at *3, 1984 U.S. Dist. LEXIS 14828, at * 9 (S.D.N.Y. July 19, 1984)). "The . . . determination . . . must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, including any functional limitations that result from the impairment, with the corresponding criteria shown for the listed

impairments." *Hamedallah*, 876 F. Supp. 2d at 142. The ALJ must either engage in this comparison or expressly adopt a medical source statement that discusses the medical evidence and arrives at express conclusions concerning the Listings. *Id.*; *Easley ex rel. P.S.J. v. Colvin*, No. 13-CV-923S (WMS), 2014 WL 5465411, at * 3, 2014 U.S. Dist. LEXIS 152919, at * 8 (W.D.N.Y. Oct. 28, 2014) (where claimant's symptoms appear to match those described in a Listing, "[t]he ALJ must either engage in [a comparison of the symptoms and the criteria for the listed impairment], or expressly adopt a medical source statement that discusses the medical evidence and arrives at express conclusions concerning the Listings."). The ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion to enable a meaningful review." *Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 173 (N.D.N.Y. 2010) (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citations omitted)).

The Court finds that A.R.C.'s symptoms, i.e., Perceptual Reasoning Index of 63 and ADHD and fine motor control issues identified as severe impairments, appear to match those described in 112.05D. The Court further finds that the ALJ failed to engage in a comparison of A.R.C.'s symptoms with the criteria of 112.05 generally or 112.05D specifically. The Commissioner has argued that the comparison was unnecessary because the ALJ expressly adopted the joint evaluation of Drs. Prowda and Puttanniah concluding upon a review of the evidence that A.R.C.'s impairments did not meet, medically equal or functionally equal a listing. (Dkt. No. 14 at 11.) However, Drs. Prowda and Puttanniah did not discuss the medical evidence relevant to the Listing, except to the extent it was touched upon in their functional equivalence assessment, and did not arrive at an express conclusion regarding whether A.R.C.'s impairments met or medically equaled 112.05D. (T. at 197-202.) Their joint report made no mention

whatsoever of Listing 112.05.

The ALJ's single sentence explanation that he had given close consideration to the child impairment listings, including 112.05, and concluded that the record did not contain adequate clinical findings needed to meet or medically equal any of the Listings is plainly insufficient. *See Martinbeault ex rel. R.J.M. v. Astrue*, No. 1:07-CV-1297 (DNH/VEB), 2009 WL 5030789, at * 5, 2009 U.S. Dist. LEXIS 116246, at * 15 (N.D.N.Y. Dec. 14, 2009) (citing *Brown ex rel. S.W. v. Astrue*, No. 1:05-CV-0985 (NAM/RFT), 2008 WL 3200246, at * 10, 2008 U.S. Dist. LEXIS 60221 at * 29-30 (N.D.N.Y. Aug. 5, 2008) ("Where the claimant's symptoms as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings.")); *Hamedallah*, 876 F. Supp. 2d at 144 ("The ALJ provided a one-sentence, conclusory analysis [of the impact claimant's severe impairments had on the determination that he did not meet any of the criteria of 112.05D] without any recitation of the facts or medical evidence. The ALJ's failure to explain the conclusion is plain error.").

A court "cannot . . . conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered." *Morgan ex rel. Morgan v. Chater*, 913 F. Supp. 184, 188-89 (W.D.N.Y. 1996) (quoting *Ryan v. Heckler*, 762 F. 2d 939, 941 (11th Cir. 1985)). Moreover, "where there is reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, even if the ultimate decision may be arguably supported by substantial evidence, the Commissioner's decision may not be affirmed." *Martone v. Apfel*, 70 F.Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing *Johnson*, 817 F.2d at 985).

In light of the ALJ's failure to provide a sufficient rationale, the Court is unable to conclude that the ALJ's finding that A.R.C. fails to meet or medically equal 112.05D of the Listings is supported by substantial evidence and recommends remand. Plaintiff argues that A.R.C.'s impairments clearly meet the Listing 112.05D, and that the case should be remanded for the calculation of benefits. (Dkt. No. 9 at 16-17.) However, analysis of whether A.R.C.'s symptoms satisfy all of the criteria of Listing 112.05D is a task properly left to the Commissioner. *Hamedallah*, 876 F. Supp. 2d at 144. The Court recommends that upon remand, the ALJ be directed to compare all evidence concerning A.R.C.'s impairments with the corresponding criteria in Listing 112.05D, and to address specifically whether there is substantial evidence supporting a finding that A.R.C. has "significantly subaverage general intellectual functioning with deficits in adaptive functioning," which along with satisfying the requirements of subpart D, is necessary to establish that A.R.C.'s impairments meet or medically equal the requirements of the Listing.[4] *See Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) ("The threshold diagnostic description of mental retardation contained in SSA regulations requires that the applicant have 'significantly subaverage general intellectual functioning *with* deficits in adaptive functioning.'") (emphasis in original); *Martinbeault*, 2009 WL 5030789, at * 5 ("To meet or medically equal the impairment set forth in § 112.05 . . . , the claimant's impairments must be '[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.' Further, in addition to satisfying this diagnostic description, the

_____

[4] The Court expresses no opinion as to whether A.R.C.'s impairments meet or are medically equivalent to Listing 112.05D.

claimant must show that he or she meets one of the six subparts of the Listing (112.05(A)-112.05(F)).")

B.    **Plaintiff's Contention that the ALJ Failed to Properly Develop the Record Where He Did Not Obtain A.R.C.'s School Records and Failed to Take A.R.C.'s Testimony**

Plaintiff claims that the ALJ erred in failing to issue a subpoena for A.R.C.'s school records from March 1, 2010, to the present, IEPs, psychological and achievement testing, report cards, OT/PT records and disciplinary reports following Percy Browne Intermediate School's failure to provide those records in response to his written request following the hearing.  (Dkt. No.  9 at 17-19.)  In addition, Plaintiff claims that the ALJ erred in not taking testimony from A.R.C., who had not been brought to the hearing by her parents.  *Id.*

The responsibility of an ALJ to develop the record is a well-established principle of Social Security law.  *See Echevarria v. Secretary of Health and Human Services*, 685 F.2d 751, 755 (2d Cir. 1982) (due to the non-adversarial nature of social security proceedings, the ALJ has a duty to fully develop the record).  Where, as here, a claimant is unrepresented at the hearing, "the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *Id.*; *see also Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) ("[t]he ALJ has a duty to adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts [are] sufficiently developed and considered.") (citation and internal quotation marks omitted); *Butts v. Barnhart*, 388 F.3d 377, 286 (2d Cir. 2004) ("[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits."), *amended on other grounds*, 416 F.3d 101 (2d Cir. 2005).

However, the ALJ's duty to develop the record is not without limits.  "[W]here the

evidence received by the ALJ is consistent and sufficient to determine whether a claimant is disabled, further development of the record is unnecessary, and the ALJ may 'make [his] determination or decision based on that evidence." *Guile v. Barnhart*, No. No. 5:07-cv-259 (GLS), 2010 WL 2516586, at * 3, 2010 U.S. Dist. LEXIS 58423, * 6-7(N.D.N.Y. June 14, 2010) (quoting 20 C.F.R. § 404.1527(c)(1)); *see also Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (when there are no obvious gaps in the administrative record, the ALJ is not obligated to seek additional information).

Plaintiff has argued that the school records requested by the ALJ and A.R.C.'s testimony might have changed his determination that Plaintiff's testimony that A.R.C. was in special class in fourth grade and had an IEP was not fully credible because it was not supported by school records. (Dkt. No. 9 at 19.) The Commissioner contends that there is no indication that A.R.C.'s school records would have supplied any relevant information not already in the record, and that the record evidence, including no indication in the teacher questionnaire responses that A.R.C. needed special education services and Drs. Magurno and Moore's evaluations which indicate that A.R.C. had been in a regular third grade class, provided a sufficient basis for the ALJ to reasonably conclude that A.R.C. was not receiving special services and did not have an IEP. (Dkt. No. 14 at 14.)

The ALJ obviously found A.R.C.'s school records sufficiently important to his determination of her disability to send a written request for those records following the hearing. Arguably he should have further pursued obtaining those records. However, the Court does not find clear error on his part in failing to do so and in failing to schedule another hearing to take A.R.C.'s testimony with respect to the functional domain assessment in his decision.

Nonetheless, because the school records, and perhaps A.R.C.'s testimony, might well provide evidence relevant to the question of whether A.R.C.'s impairments meet or medically equal Listing 112.05D, the Court suggests that in the event the District Court orders remand for determination of that issue, the Commissioner seriously consider taking further steps to obtain A.R.C.'s school records and taking A.R.C.'s testimony in connection with his consideration of the Listing.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[5] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: June 8, 2015
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[5] Sentence four reads "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g) (2005).